## MINNIE HALLIBURTON v. THE STATE.

### *No. 55. Decided April 19.*

**1. Murder—Insulting Conduct to Female Relative.**—On a trial for murder, where one of the defenses relied upon was insulting and brutal conduct on the part of deceased toward the mother of defendant, and the court, as to such defense, instructed the jury, that "insulting words and conduct to a female relative does not authorize a defendant to go and seek the party so offending for the purpose of having a difficulty with him, with the intention of killing him or doing him some serious bodily harm; and if a person should do so, notwithstanding the insulting words or conduct, the killing would not, for that reason, be reduced from murder to manslaughter, if it be murder in the first instance:" *Held*, that the charge was erroneous, in that it practically announces the doctrine that passion which can be controlled makes the homicide manslaughter, while passion that can not makes it murder.

**2. Same—Murder—Manslaughter.**—It can not be asserted, as a question of law, that any character of meeting between deceased and defendant, whether casual or intended, would make the homicide murder. The controlling question is, whether the homicide was the result of passion from adequate cause, or was done deliberately and upon a premeditated design, and this is always a question of fact for the jury alone.

**3. Same.**—See facts stated in the opinion upon which the jury were compelled, under the charge of the court, to find the defendant guilty of not less than murder, and upon which, but for said charge, they might have found him guilty of manslaughter.

APPEAL from the District Court of Gonzales. Tried below before Hon. GEORGE McCORMICK.

Appellant was jointly indicted with Bookey Foster and Larkin Halliburton for the murder of one E. P. Halliburton.

At the trial, on motion of defendants, they were allowed to sever, and under their agreement defendant Minnie Halliburton was first placed on trial, which trial resulted in his conviction for murder in the second degree, with his punishment assessed at twenty years confinement in the State penitentiary. .

E. P. Halliburton, deceased, was the father of Larkin Halliburton and this defendant, and the defense was that the killing was caused by his brutal and insulting conduct toward their mother. Mrs. E. P. Halliburton, wife of deceased, was also the sister of the codefendant Bookey Foster.

In addition to the summary of facts as stated in the opinion of the court, we deem it only necessary to give the testimony of Mrs. Halliburton, the wife of the deceased, as follows, viz.:

Mrs. Fannie Halliburton, sworn for the defense, said: I was the wife of E. P. Halliburton, and the mother of Minnie and Larkin Halliburton, and sister of Bookey Foster. We lived near Waelder, in Gonzales County. I have eleven children, the oldest being the defendant now on trial. He was 21 years old in June, 1892. My youngest child is 3 years

old next September.   My husband, E. P. Halliburton, was killed on the
evening of January 26, 1892.   On Sunday night before the Tuesday on
which he was killed, I left home with seven children, the oldest being 14
years old, and went about one-half of a mile to Milburn Halliburton's
place, where we spent the night; we left home about dusk.   I left home
on account of the kicking and abuse of my husband.   He told me to
leave.   He had been drunk for a long time, and had treated me very
badly.   He had been drinking more in the last year, as he had a store
and was selling liquor.   I stayed Sunday night at Milburn Halliburton's,
and went back home early Monday morning before breakfast.   It was
quite cold; a norther was blowing.   When I got home I found my hus-
band and John Wesley, a negro man, sitting in the room by the fire.   I
went to the door and said, "Papa, I have come back; can I come in to
the fire?"   He said, "No, you can not."   I went into the room and
knelt before him and begged him to let us stay, but he said no, and made
me go out.   He then told me to go in another room and make a fire.   I
did so, and took the children in the room.

John Wesley left, and my husband came in and asked me where John
and Larkin were, and I told him I did not know.   He said, "I will make
you tell me better than that."   He then got him three switches, threw
me down on the floor, pulled my clothes up over my head, put his foot
on my neck, and whipped me.   While he was whipping me he called Pet,
my oldest daughter, to come and see it, and she looked in and then picked
up the baby and ran out in the yard with it.   This was Monday morning.
About 10 o'clock, after my husband had left, my brother Bookey Foster
and my son Minnie Halliburton rode up, got down, came to the front of
the gallery, where I met them and told them to leave, and told Minnie
that his father had whipped me very bad.   They went off and I never
saw them any more until after the killing.   My husband came back in
the afternoon.   I stayed at home Monday night; slept in the same room,
but did not sleep in the same bed with my husband.

The next morning early my husband got his "morral," hung it over his
shoulder, pointed his finger at me, and said, "Mamma, I am going to kill
you and Minnie and Larkin before night."   I asked him "What for?"
and he said, "You will know well enough when it is done."   He then
went off, and I never saw him again to speak to him, until after he was
dead.

Texana Halliburton came over to the house about 10 a. m. and stayed
a few minutes.   I left shortly after she left with the children, and went
over to Milburn Halliburton's.   I left because my husband told me he
was coming back, and I was afraid of him.

When I left home no one was there.   It was as clean as the palm of
my hand.   Minnie and Larkin Halliburton and Bookey Foster were not
there.   I don't know where they were.   I don't know where Matt Halli-

burton was. They were not at the house when I left. I went before the grand jury; testified correctly there. I don't remember that I testified before the grand jury, that I told Minnie that his father had abused me. What I told there was true. I never saw Minnie and Larkin Halliburton and Bookey Foster, or either of them, coming towards the house with guns when Texana was there, and never told her she had better hurry off before they got there. I never heard the little child say, "Yonder comes Minnie and Larkin and Bookey." I sat in the little back room in Milburn Halliburton's house for about three hours, and saw my husband as he passed in the road towards the house. Minnie came over and told me "to come on home; he is dead." He never said, at that time, who killed him. I took the children and went with him. As we went over he told me, "I killed him; I had it to do." When we got there we went in the house. I did not go near the body. Minnie, after we got in the house, told me, that his father came into the yard, and he (Minnie) went out on the gallery and spoke to him, and he (deceased) shot at him (Minnie), and he went into the side room. I knew of no bad feeling between any of them — Minnie and Larkin and Bookey Foster and the deceased. Neither of my boys had any guns or pistols that I knew of. My husband always went armed.

*Fly, McNeal & Hopkins* and *Glass & Burgess*, for appellant.—Under the Penal Code of Texas, when a man hears of the insulting words or conduct of another towards a female relative, if he prepares weapons, seeks the person so offending, and kills him on sight, the slayer would not be guilty of murder in either degree; and this language of the trial judge, "But it does not authorize a defendant, after the happening of such conduct or the uttering of such words, or after he has heard of it, to go and seek the party," etc., is contrary to the spirit of the Texas code. Eanes v. The State, 10 Texas Cr. App., 421; Paulin v. The State, 21 Texas Cr. App., 436; Orman v. The State, 22 Texas Cr. App., 604; Howard v. The State, 23 Texas Cr. App., 265; Norman v. The State, 26 Texas Cr. App., 221.

The charge of the trial judge restricts the meeting with deceased to a casual chance meeting, which we hold can not be reasonably deduced from the statute on the subject. The statute says, "It must appear that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the person killed, after having been informed of such insults." There is nothing to indicate that the statute intends that the man who has had his wife, mother, daughter, or sister grossly insulted must sit down and wait for a chance meeting in order that he may avenge his wrong. We hold that a man might be so enraged by hearing of insulting words or conduct towards a female relative that he might

arm himself and go out and seek the insulter and slay him, and if he did so he would only be guilty of manslaughter. The mere fact that a man under such circumstances should seek the man who had insulted his female relative, and should take his life, is not evidence that he was not under the influence of "anger, rage, or sudden resentment." And it was for the jury to determine whether or not the killing arose from the conduct of deceased toward the mother of appellant upon the first meeting. The trial court, though, assumes the right to say, that if the meeting was sought by defendant, then no matter what the condition of his mind when the homicide was committed, "notwithstanding the insulting words or conduct, the killing would not for that reason be reduced from murder to manslaughter." The length of time elapsing between the time when the insulting words or conduct was made known to defendant and time of killing can cut no figure; and whether defendant sought the meeting or not, the question is, was the insulting conduct of deceased towards defendant's mother communicated, and did he on the first meeting afterwards with deceased, under the influence of rage, anger, or sudden resentment, arising from the fact of the insulting conduct, kill the deceased?

The trial court bases the criticised charge upon the decision in Breedlove v. The State, 26 Texas Criminal Appeals, 446. This was a case in which it was sought to reduce a killing to manslaughter on account of the adultery of the person killed with the wife of the slayer. Under this section the killing must occur as soon as the fact of an illicit connection is discovered. Of course this does not mean, if the adulterer is not immediately present that the killing could not be manslaughter; but we hold under this section, if Breedlove had gone at once, sought his antagonist, and killed him, he would only have been guilty of manslaughter. But he did not go immediately, but waited until night, and then laid in wait and killed his wife's paramour. We believe the Breedlove decision is wrong, but if not, the language of sections 3 and 4 are so different as to require very different construction. Suppose the man, under section 4, seeks his antagonist and kills him when he first sees him, is not this the first meeting contemplated by the statute?

There is such insulting language and conduct that might be used toward a female that might influence the mind of a high-strung gentleman to such an extent that it might take months for "cooling time." This, like the provocation itself, must depend upon the nature of man and the laws of the human mind, as well as upon the nature and circumstances of the provocation, the extent to which the passions have been aroused, and the fact whether the injury inflicted by the provocation is more or less permanent or irreparable. The passion excited by a blow in a sudden quarrel, though perhaps equally violent for the moment, would be likely much sooner to subside than if aroused by a rape upon a sister or a daughter, or the discovery of an adulterous intercourse with a

wife; and no two cases of the latter kind would be likely to be identical in all their circumstances of provocation. No precise time, therefore, in hours or minutes, can be laid down by the court as a rule of law within which the passions must be held to have subsided and reason to have resumed its control, without setting at defiance the laws of man's nature, and ignoring the very principle on which provocation and passion are allowed to be shown at all in mitigation of the offense. The question is one of reasonable time, depending upon all the circumstances of the particular cases, and in a majority of cases is one peculiarly within the province of the jury to determine. Maher v. The People, 10 Mich., 213. The foregoing has been quoted approvingly in the Eanes case, above cited.

We hold that the twentieth section of the charge is on the weight of the testimony; and invades the province of the jury in passing upon the weight of the evidence. In the case of Melton v. The State, 24 Texas Criminal Appeals, 60, the court says: "On the first day, when he was seeking deceased for that purpose, it is reasonably made to appear that he might easily have made the effort and perhaps accomplished his vengeance, but he did not do so." While it is not directly so decided, the plain inference to be drawn from this language is, that if he, when he sought the deceased, had killed him on sight, the offense would have been manslaughter. Instead of the charge given by the court, we hold, that "the jury should be instructed that the time intervening between the slayer's apprisal of the insult and his first meeting with deceased is not a material consideration." Williams v. The State, 24 Texas Cr. App., 666, as to the word "meet" or "meeting;" Pitts v. The State, 29 Texas Cr. App., 374.

*R. L. Henry*, Assistant Attorney-General, for the State.—While it is true the law prescribes no time necessary to elapse between the insulting act or words and the killing, it is nevertheless true, that if the slayer's mind is cool, sedate, and deliberate, the killing will be murder; the law allowing excuse for passion and anger such as renders the mind incapable of cool reflection, but otherwise, as in the case at bar, when the facts show conclusively that the mistreatment of deceased's wife, the mother of appellant, occurred some days before the killing, and appellant and his coconspirators began two days before the killing to collect arms and implements with which to do the deed; and after leaving deceased on the streets of Waelder, where they had all been that morning, and where they must have seen deceased, took up the line of march for his house, travelling three or more miles through the brush and briars and across wire fences, avoiding the public road that led straight there, and after arriving there secreting themselves in the house of their unsuspecting victim, to shoot him from ambush as he entered his own doorstep. If this is man-

slaughter, then our code pronounces no penalty against murder in the first degree. The doctrine enunciated in Eanes v. The State 10 Texas Criminal Appeals, 421, and that line of decisions, does not warrant any such perversion of the law. Breedlove v. The State, 26 Texas Cr. App., 445; Willson's Crim. Stats., sec. 1022, and authorities cited; Ex Parte Evers, 29 Texas Cr. App., 539; Ex Parte Johnson, 30 Texas Cr. App., 279.

SIMKINS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at twenty years in the penitentiary, from which he appeals.

There is but one question that need be considered. Appellant, his brother, and his maternal uncle went to the house of deceased in the morning, armed, waited his return from the village, and killed him as he was coming up his front walk. Deceased was the father of appellant and his brother. The defense was self-defense, and insulting and brutal conduct to their mother. On the latter ground of defense, the court charged the jury, that "insulting words and conduct to a female relative does not authorize a defendant to go and seek the party so offending for the purpose of having a difficulty with him, with the intention of killing him or doing him some serious bodily harm; and if a person should do so, notwithstanding the insulting words or conduct, the killing would not for that reason be reduced from murder to manslaughter, if it would be murder in the first instance." It is evident, that under this charge the jury could not have found a verdict less than murder, even though they found as a fact that appellant had been roused to desperation and passion by the gross insult and injury offered to his mother, and had killed his father on the first meeting. The charge is not the law. It is not true that one whose female relative is insulted commits murder because he seeks and kills the offender; on the contrary, the very fact that he seeks him and brings on the difficulty with the intent to kill may be the most cogent evidence of the existence of that condition of the mind necessary to reduce the homicide to manslaughter. To sanction the doctrine asserted in the charge—that such hostile meeting must be always casual, and not sought for and intended—is practically holding that passion that can be controlled makes the homicide manslaughter, while passion that can not be makes it murder. It can not be asserted, as a question of law, that any character of meeting, whether casual or intended, makes the homicide murder. The controlling question is, whether the homicide was the result of passion upon adequate cause, or was done deliberately and upon a premeditated design; and that is always a question of fact upon which the jury alone may speak.

In the case at bar the evidence for the State shows, that appellant, on the 26th of January, 1892, then residing with his father, together with

his brother and maternal uncle, having prepared arms and ammunition, went home and awaited the return of the father from the village, where he had gone to sell a load of cotton; that the mother, the wife of deceased, went over to her brother-in-law's house about the time her husband was expected back, and stood in the house looking at her husband returning to his home.  The husband and wife had lived together for twenty years; they had eleven children, the youngest 3 years of age. Just after going into the gate, deceased was riddled with bullets by his two sons and brother-in-law, and instantly killed.  It was shown by the evidence of the mother, that immediately after the killing appellant went over after her and told her, "to come home; he is dead;" and on the way home told her he "killed his father, and had to do it;" that when his father came he went on the gallery to speak to him, and his father shot at him.  Mrs. Halliburton, the mother of appellant, also testified fully to every brutal act and grossly insulting conduct to herself the day before the killing, coupled with threats against her own life and that of her sons, who lived in the house with their parents, all of which she at once communicated to them.  The evidence on the part of the State shows the ill treatment occurred a week before the killing, and strongly supports the theory that the homicide was deliberately planned and executed, and that the wife was an accomplice, who knew of and concurred in the plot against the life of her husband; that she was on the watch that morning for the conspirators, who came by a back way, through the field, and, as soon as they arrived, she carried her young children, seven in number, over to her brother-in-law's to remove them from the danger of the anticipated fight between her husband and sons; that they coolly awaited and killed him, cross-firing upon him from the front windows as he came through the gate and started up the sidewalk of his own home. If the theory of the State was sustained, there is no evidence of passion or self-defense; it was murder upon express malice; but the jury found that the homicide was but murder in the second degree, though it was committed under circumstances strongly illustrating premeditation and malice, and by sons upon a father, a relationship which would ordinarily deprive the occurrence of the considerations of human frailty and passion that the law throws about parties not so related.  To have reached such a verdict the jury must have believed appellant was acting under the impulse of uncontrollable passion on account of insulting conduct to his mother, and, if so, they were compelled, under the charge, to find the appellant guilty of not less than murder.  The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.