## R. H. JONES V. THE STATE.

*No. 341.   Decided June 16.*

1. **Charge Must Submit the Law upon All Issues.**—Whatever may be the views entertained by the court as to the truth or falsity of evidence adduced, it is incumbent on the trial judge to charge the jury, under appropriate instructions, the law applicable to every phase of the testimony.

2. **Manslaughter—Insulting Conduct to Female—First Meeting.**—Under subdivision 4, article 597, Penal Code, "insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide" is deemed adequate cause to reduce the offense from murder to manslaughter, but it must appear (where the insulting words or conduct were not in the presence of defendant) "that the killing took place as soon thereafter as the party killing may meet with the person killed after having been informed of such insults." Penal Code, art. 598. *Held*, that up to the time of the first meeting the law prescribes no limit to the subsidence of the passion supposed to have been engendered by the information received, provided this passion is such as renders the mind incapable of cool reflection and actually exists, from such adequate cause, at the time of the killing. Penal Code, arts. 593, 602.

3. **Same—Charge.**—On a trial for murder, where the evidence presents the issue of a killing by defendant upon a first meeting after information of insulting conduct towards a female relative, it is the duty of the court to submit the issue of manslaughter, and a failure to do so gives cogency to such evidence in its probative support of express malice, and is tantamount to deciding his extenuating evidence against him.

4. **Same—Standpoint of Defendant.**—On a trial for murder, where the defense was that the killing was at the first meeting after information received by defendant from his wife of insulting conduct towards her from deceased, *Held*, the facts must be viewed from the standpoint of defendant, and if the adequate cause and passion existed in his mind his offense would be of no higher grade than manslaughter, although such insulting conduct never occurred, provided he believed it had; and *held*, further, that the charge of the court should be framed so as to submit this important issue to the jury.

5. **Same—Evidence—Antecedent Acts and Conduct of Deceased.**—On a trial for murder, where the defense was insulting conduct of deceased towards the wife of defendant, *Held*, that in determining the character of such conduct the fact that deceased had committed a rape upon the wife, prior to her marriage with defendant, was admissible testimony upon the issue of manslaughter.

6. **Charge—Action of Appellate Court on Habeas Corpus Not to Control the Charge.**—The fact that this court, upon appeal by a defendant charged with murder, has affirmed the judgment of the lower court refusing bail, under a writ of habeas corpus. can not and does not deprive the defendant of his right, upon final trial, to have all legitimate issues raised by the evidence submitted to and passed upon by the jury, as well as credibility of witnesses and the weight of the testimony; and the case must be tried in the same manner and under the same rules of law as if it had never

been before a court for any purpose, unless some question of evidence is settled by the court on the appeal for bail.

7. **Same—"Cooling Time"—Question of Law or Fact.**—On a trial for murder, where the defense was a killing on the first meeting with deceased after information received by defendant of his insulting conduct towards defendant's wife, and the court charged upon "cooling time," *Held*, said charge (which charge is set out in the opinion) is erroneous. "Cooling time" is not a matter of law; the condition of the mind is not a question of time or law, but one of fact to be left to and determined by the jury. The instructions substituted time for the actual condition of the mind at the time of the killing.

APPEAL from the District Court of Dallas.    Tried below before Hon. CHAS. FRED. TUCKER.

On a trial under an indictment charging him with the murder of one W. G. Veal, appellant was convicted of murder in the first degree, his punishment being assessed at imprisonment for life in the penitentiary.

This is the second appeal in this case.    The first was an appeal from a trial on a writ of habeas corpus refusing bail after he was indicted for the murder of W. G. Veal.    That case will be found reported as Ex Parte Jones, 31 Texas Criminal Reports, 422.    A full statement of the facts is made in the report on that appeal; and while there were some witnesses who testified on this trial who were not called and did not testify on the habeas corpus trial, the main and most important evidence is shown by the former report, and it is unnecessary to give any of the new testimony.

No briefs have come to the hands of the Reporter.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the first degree, his punishment being assessed at a life term in the penitentiary.    In extenuation of the homicide, he introduced evidence to show the killing occurred on account of insulting conduct towards his wife.    In this connection it was testified by the wife of the accused, that while she was a widow, and prior to her marriage with appellant, the deceased, W. G. Veal, approached her bed and had enforced sexual intercourse with her; that deceased, subsequent to her marriage to appellant, visited her home, knocked at the door, and was admitted by the servant girl; and upon another occasion visited her house.    Both visits occurred in the absence of her husband.    Testifying in regard to the former visit, Mrs. Jones said:  "Captain Veal came in and spoke to me.    I don't remember what he said.    I suppose he said, 'good morning,' or 'good evening.'    I stood up and said, 'What do you come here for?    You know you are not welcome in my house.'    He did not leave then right away.    I do not know what he said exactly.    I kept insisting, and tried to drive him, or kept trying to get

him to go away, saying I did not want him there, or something like that. He turned as if he would go, but stood a moment, and then he came towards me. He came towards me just this way, with his arms stretched out.. [Witness stood up and showed how it was.] I said, 'Don't you come here, Captain Veal. You forget where you are. You forget that I have a husband to protect me.' He turned and left the room.'' In reference to the second visit, she stated: ''About eight years ago he came to my house again. * * * This was in the day-time, too, but I do not know what time in the day, or the date. I was in the kitchen then, busy at work. One of my little children came into the kitchen, and said, 'Mamma, there is a gentleman at the door.' I went out there without knowing or dreaming who it was. He was standing in the front door, and I only went as far as the back door, and I saw him there, and I said, 'What do you come here for? You know it makes me miserable to see you. You know better than to come to my house.' It seems to me that he said something, but I do not remember what it was. I think he remarked that he was taking a walk, and thought he would come in and see how I was getting along, or something like that. He did not make any movement or gesture towards me, but turned and left the house.''

About a year before the homicide these matters were communicated to the appellant by his wife, and produced a decided and marked impression upon his mind and life, as testified by the wife, and thenceforward his life and conduct underwent a great change. Speaking of the effect of her communication to her husband, she testified, that ''Dr. Jones was terribly shocked and distressed when I told him the story. He said, 'My God! How could it be true? How could it have happened?' He said, 'If an archangel had told me I could not have believed it. I could not have believed anybody on earth but yourself.' He did not sleep any more that night that I know of. I saw what effect it had on him, and I saw that he was so distressed I regretted telling him. I did not sleep any more myself. I always felt as if I could not die satisfied, and could never be utterly happy, until I did tell him. I told him that I could not have died satisfied without telling him. These things have been the subject of discussion between Dr. Jones and myself often, both in the day-time and night, but mostly at night, as he is away in the day-time most all the time. He could never speak of it without almost crying like a child. It almost unmans him. He was nervous and restless. He did not sleep well at night. He was just mortified and distressed more than he could bear, almost. I have noticed the expression of his eyes when he would speak about it. He always had a troubled and sad look and expression. He always seemed terribly grieved over it. He has not hardly seemed like the same man since. * * * All of this was not his way of doing before I told him.''

While there is more of this same character of evidence, we have quoted enough to illustrate the question in regard to the failure of the court to instruct the jury upon the principles of manslaughter, and his refusal to give special instructions asked in this respect. There is a serious conflict in the testimony as to whether appellant had ever met deceased prior to the killing, after being informed of his conduct towards Mrs. Jones. Evidence was also introduced tending to show that appellant killed Veal because of reasons and motives other than the insulting conduct towards his wife. In regard to the condition of appellant's mind at the time of the homicide, the testimony is also conflicting. It was stated by some of the witnesses that he was very much excited, while others testified that he was not more so than a slayer would usually be when a homicide had been committed. There was a conflict in the evidence in regard to these various issues. In such state of case it is the duty of the court to instruct the jury in regard to the law applicable to the issues thus presented, leaving the weight of testimony and the credibility of the witnesses to be decided by the jury. Whatever may be the views entertained by a court as to the truth or falsity of evidence adduced, it is incumbent on him to charge the jury, under appropriate instructions, the law applicable to every phase of the testimony adduced on the trial. This is expressly commanded by the statute. To hold otherwise would authorize the trial judge to submit the law applicable only to such evidence as he might deem worthy of credit, discarding such as he believed unworthy of credence, and often, doubtless, thus impressing the minds of the jurors with the fact that the testimony was fabricated or false, and in this way it would be used strongly against the accused by the jury. The only safe rule is to follow the statutory law of the State in all criminal trials.

Under our statute, "insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide" is deemed adequate cause to reduce a homicide from murder to manslaughter. Penal Code, art. 597, subdiv. 4. In such state of case it is further provided, that "* * * it must appear that the killing took place immediately upon the happening of the insulting conduct, or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the person killed after having been informed of such insults." Id., art. 598. We are dealing in this case only with that clause of the statute which reduces the homicide to manslaughter when the killing occurs upon the first meeting after the party killing has been informed of the insulting conduct on the part of the party killed. It will be borne in mind that subdivision 1 of article 594, which provides, "that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation," has no application to the case in hand. The insulting con-

duct did not occur in the presence of Jones. He was informed of it, and in such state of case he could kill as soon as he should meet Veal after learning of the conduct, and be guilty of no higher crime than manslaughter, provided the other constituent elements of that offense were present. As was correctly said by Presiding Judge White in the Eanes case, 10 Texas Criminal Appeals, 421: "Up to the time of his first meeting, the law prescribes no limit for the subsidence of the passion supposed to be engendered by the information received." The length of time in such state of case does not control the condition of the mind. If the killing takes place on the first meeting, then it is true in this as in all other cases, that in order to reduce the offense to manslaughter it is necessary not only that the adequate cause (insulting words or conduct) existed to produce anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection, but such state of mind must actually exist at the time of the commission of the offense. Penal Code, arts. 593, 602. "There must exist not only the adequate cause, coupled with the defendant's knowledge of its existence, but the disturbed condition of the mind, and the necessary passion must also exist in order to reduce the killing from murder to manslaughter." Massie v. The State, 30 Texas Crim. App., 64. "Adequate cause," unattended by the requisite "passion" rendering the mind incapable of cool reflection, may become evidence of highly probative force, showing murder upon express malice. So, in this case, the court, having failed and refused to instruct the jury in regard to the insulting conduct, left this evidence bearing alone upon the question of murder. It then may have become evidence of a most cogent nature tending to show the killing to have been upon express malice; and the evidence adduced and relied on by him to mitigate his crime and punishment was resolved adversely to him by the action of the court refusing to submit the issue of manslaughter. The truth or probable truthfulness of his extenuating evidence was thus decided against him by the court. If the insulting conduct towards Mrs. Jones by Veal was the real cause of the homicide, or there was a reasonable doubt of that fact, and the killing occurred at the first meeting after the accused had been informed of such conduct, and, at the time of the killing, appellant's mind was in such a state of anger, rage, or resentment as to render it incapable of cool reflection, then his offense would be of no higher grade than manslaughter. This would be the case although such insulting conduct had never occurred, provided appellant actually believed it had. The homicide on the trial must be viewed from the standpoint of the accused. The facts and circumstances should be analyzed and passed upon as they were viewed by him at the time he acted upon them. If, in this case, appellant believed the insulting conduct communicated to him by his wife actually occurred as detailed

by her, then to his mind such conduct was a reality, and the charge should have been so framed as to submit this important issue to the jury. Men often act upon the most important affairs and interests in life upon mistakes of fact. They often risk honor, reputation, fortune, and life upon mistakes of fact; of course, believing at the time they are not mistaken. The guilt of the accused party, in such state of case, should not depend upon the existence or non-existence of the fact itself, but upon the circumstances as they appeared to and were understood by him at the time of his acting upon them. Such questions are matters of fact to be solved by the jury under appropriate instructions. That the insulting conduct had or had not occurred would have been immaterial if she had so informed Jones, and he believed her. If the jury should believe that Mrs. Jones informed her husband of the conduct of deceased towards her, and that his passions were thereby aroused to the extent of rendering his mind incapable of cool reflection, and that, while his mind was thus inflamed, he shot and killed Veal upon first meeting with him after receiving such information, his offense would be of no higher grade than manslaughter. A solution of this question adversely to appellant would require a verdict of murder against him.

But it may be contended that Veal's conduct towards Mrs. Jones was not "insulting," within the meaning of the statute. To determine whether this conduct was or was not insulting, all the testimony bearing on that subject, or in any manner relating to it, should be looked to, including the rape alleged to have been perpetrated upon her by Veal prior to her marriage to appellant. This conduct tends to characterize the meaning, purpose, and object of his visits to her residence subsequent to the marriage. Considered alone, and apart from the rape, said visits, acts, and conduct, as above stated, may be of doubtful import. But, taken in connection with the rape sworn to by Mrs. Jones, its character is determined and fixed. If her relation of these matters is true—and its truth or falsity is a question of fact for the jury, and not this court in this proceeding—it would be reasonable and natural for appellant, believing the truth of her statements, to presume that the visits of deceased to his wife were for the purpose of gratifying his lustful desires. We have held the rape occurring before her marriage with appellant could not be relied upon to reduce the homicide to manslaughter; but we have not held that such rape could not be looked to for the purpose of giving character to his conduct towards Mrs. Jones occurring after marriage.

Again, it may be urged that all the facts, those relating to the rape as well as those occurring when deceased visited Mrs. Jones after marriage, were before this court, and bail refused, and therefore the court did not err in refusing to instruct the jury in regard to the law applicable to manslaughter. However plausible this may appear, it is wholly

untenable, and is a very startling proposition. Carried to its logical conclusion and final analysis, the trial court, the facts being the same, should not submit the law applicable to murder of the second degree; and a refusal of bail by this court would preclude every issue save murder of the first degree. While murder of the second degree and manslaughter may be suggested by the evidence, this court may nevertheless be convinced that the accused is guilty of murder of the first degree, and therefore refuse bail. But it certainly would not follow that, in such state of case, the jury would have no right to pass upon the issues thus presented on a final trial. The opinion of this court, refusing bail, is not conclusive upon these matters, nor does it preclude the accused from the right to have them submitted to a jury for their determination, when suggested by the evidence. Nor can the opinion of this court in such a state of case be substituted for that of a jury whose province it is, under the law, to pass upon the credibility of the witnesses and the weight of the testimony. That this proposition is correct is established by the fact that the almost universal practice of appellate courts is to refrain from commenting upon evidence refusing or granting bail on appeal. This practice or rule is founded upon the highest grounds of right and propriety, because such comments, if indulged, would reflect the opinion of the court in regard to the facts, and might improperly influence the jury upon the final trial of the cause.

In this connection, and bearing upon this subject, Judge Moore, in Ex Parte Miller, 41 Texas, 214, said: "And as we are not authorized to analyze and weigh the testimony to ascertain and determine whether it preponderates in favor of or against appellant; nor can we speculate as to the conclusion to which the jury may come if the case was submitted to them on the evidence in the record before us; and since, whatever may be the conclusion which should be reached by those whose duty it may be to decide it, when appellant's guilt or innocence (or, if guilty, the degree of his guilt) comes to be finally determined, a careful examination of the record does not authorize us, in view of the conflict in the evidence as to the condition of appellant's mind at the time of the homicide, to say that the proof of his guilt of a capital offense is evident, we must hold that he is entitled to bail." Such also has been the practice of this court, and its predecessor, the Court of Appeals. If the opinion of the appellate court refusing bail must conclude the trial court with respect to the propriety of submitting lesser degrees of homicide than murder in the first degree, though other degrees be suggested by the testimony, then why not permit a full discussion of the evidence by the appellate court? Why refrain from such discussion? By reference to the remarks of Judge Moore, it will be seen that the rule is fully recognized that, whatever may be the opinion of the court, district or appellate, with reference to the

guilt or degree of guilt of the party applying for bail, upon final trial the case must be tried in the same manner and under the same rules of law as if it had never been before a court for any purpose, unless some question of evidence is settled by the court on appeal for bail. In other words, every grade of crime, from murder in the first degree to negligent homicide, if suggested by the evidence, must, by proper instructions, be submitted to the jury. A doctrine more subversive of our law, more alarming in its tendency, and more fatal to that bulwark of Anglo-Saxon liberty, the jury system, could not be suggested than that this court could settle questions of fact for the jury, or that the opinion of this court must be taken as final against the accused—be substituted for that of the jury. Illustrative of the fallacy of such a doctrine, a case may be supposed wherein the accused, under an indictment charging him with murder, prosecutes his appeal from a refusal of bail, and, the judgment being affirmed, the court refuses on a final trial to submit only the law applicable to murder of the first degree. His complaint that murder of the second degree is suggested by the evidence, and the law applicable thereto should also be given in charge to the jury, is met by the proposition that the appellate court has settled this question adversely to him, and the charge is therefore refused. The latter proposition being correct, it would then be useless for him to urge, under the Constitution and laws, that he had the right to be tried on the facts by a jury, for the reason that this court has settled the evidence against him. Whatever may be the views of a court as to the weight of the evidence or the credibility of the witnesses, such court can not deprive the accused of the right of a trial by jury.

In defining "cooling time," the court charged the jury: "On the other hand, if the design to unlawfully kill has its inception and origin in an inflamed and excited mind, yet if there be sufficient time for the passion to subside and for reason to interpose, and a homicide be committed in pursuance of a design thus previously conceived, the offense is murder upon express malice, and therefore murder of the first degree." In applying the law to the facts in this connection, the following charge was given: "Or if, after considering the evidence, you shall believe that the defendant conceived a design to unlawfully kill the said Veal, and that at the time of the forming of such design his mind was not sedate and deliberate, but was in a state of excitement, and should further believe that after the formation of such design, and before the killing of Veal, there was sufficient time, under the circumstances of the case, to enable the defendant to reflect and consider upon such design, and to comprehend the nature of the act and its probable consequences, and that the defendant killed said Veal in execution of such previously formed design, at the time and place and in the manner as charged in the indictment, you will find the de-

fendant guilty of murder of the first degree, and assess his punishment accordingly." These charges were promptly excepted to, and proper bills of exceptions reserved by appellant. In the final analysis of these instructions the question of "cooling time" is made a matter of law; that is, if a sufficient length of time, under the circumstances of the case, has elapsed for the mind to cool, as a matter of law it must be cool. We do not so understand the law, viewed in the light of our statutes. The condition of the mind at the time of a homicide is a question of fact, and it is fundamental in this State that the jury should view the homicide, as nearly as possible, as did the accused at the time he committed the act. The statute fixes no time in which an excited mind is required to become cool and sedate. This question must depend upon the facts attendant upon the particular case. In the case in hand a disturbing cause of some character was disclosed by the facts; hence the charge of the court. If it grew out of the insulting conduct towards Mrs. Jones, and the killing occurred upon the first meeting with the deceased after appellant was informed of such conduct, then the law has prescribed no limit for the subsidence of the passion supposed to be engendered by the information received by him of such insults. Eanes v. The State, 10 Texas Crim. App., 421. "The controlling question is whether the homicide was the result of passion upon adequate cause, or was done deliberately and upon premeditated design; and that is always a question of fact upon which the jury alone may speak." Halliburton v. The State, 32 Texas Crim. Rep., 51; see also Utzman v. The State, 32 Texas Crim. Rep., 426. It is really not so much a question of time in which the mind may become cool and sedate, as it is one of the actual condition of the mind at the time the homicide occurs. The law has not undertaken to prescribe the time in which the mind may become cool, passing from a disturbed or enraged condition, nor indeed can it well do so. This must depend upon testimony, and not law. There is, and should be, a strong correspondence between the principle which governs in regard to the provocation and the extent to which the passions are aroused thereby, on the one hand, and that which applies to the duration of the passion on the other hand, and both must depend upon the facts attendant upon the case on trial. No general rule can well be laid down in such cases, further than that it is a question of fact to be solved by the jury. Elementary authorities and adjudicated cases agree that time should be allowed in which the passions of the slayer may become calm, and the more rational line of authority is to the effect that the question ought to be left to the jury as to whether the mind had actually become quiet. Ferguson v. The State, 49 Ind., 33–35; Maher's case, 10 Mich., 213; Eanes v. The State, 10 Texas, Crim. App., 421; 3 Rice on Ev., sec. 592.

The measure of responsibility under our statute    largely dependent upon the condition of the mind of the accused at the time of the homicide. If at the time of the homicide the mind of the slayer be calm, sedate, and deliberate, his crime would be murder in the first degree. If on the other hand it is aroused by sudden passion to the point of being beyond cool reflection, brought about by an adequate cause, the killing would usually be of no higher grade than manslaughter. Whether the mind be cool or otherwise is a question of fact, not of law, and relates to the actual condition of the mind, and not to its status merely from lapse of time. Eanes' case, above cited. That lapse of time may enter into the case as a fact may not be questioned. The vice in the charge is found in the fact that the court gave as a criterion for ascertaining the condition of appellant's mind the length of time intervening between the conception of the design to kill and the date of the homicide, instead of the actual state of the mind at the time of the killing. The instructions given substituted time for the actual condition of the mind, and made the criterion of murder of the first degree depend upon sufficient time for reason to resume its sway, instead of the fact that appellant's mind was cool and deliberate. The charge was erroneous.

The judgment is reversed and cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, concurs.

SIMKINS, Judge, expresses no opinion.