PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FÉLIX CALDERÓN PARRILLA, Defendant and Appellant.

No. 5906. Argued June 12, 1936.—Decided July 8, 1936.

*Félix Ochoteco, Jr.* and *Francisco Vizcarrondo* for appellant. *R. A. Gómez* and *Luis Janer, Prosecuting Attorneys,* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the Court.

The information filed against the defendant-appellant, for the crime of murder, reads as follows:

" . . . . The said defendant Félix Calderón Parrilla, some time before the filing of this information, that is, on March 20, 1934, in Carolina, P. R., which forms a part of the Judicial District of San Juan, P. R. then and there, unlawfully and willfully, with malice aforethought and with the express, firm and deliberate intent to kill and showing that he had a perverted and malignant heart, caused the unlawful death of a human being, Justo Maldonado Guzmán, whom he assaulted and battered with a revolver, which is a deadly weapon, inflicting on him several bullet wounds, of a serious nature, and as a consequence of the said bullet wounds received, the said Justo Maldonado Guzmán died on March 20, 1934, in Carolina, and that such wounds were inflicted by the defendant Félix Calderón Parrilla on the now deceased Justo Maldonado Guzmán, with the intent to kill him."

After the trial, the jury returned its verdict convicting the defendant of murder in the second degree. A motion for a new trial was denied, and the court subsequently sentenced the defendant to 16 years in prison. The present appeal has been taken from that sentence.

324

The refusal of the lower court to give the jury the following instructions requested by the defense is assigned as a fundamental error:

"1.—Voluntary manslaughter is the taking of the life of a human being upon a sudden quarrel or in the heat of passion.

"2.—If you, gentlemen of the Jury, have a reasonable doubt as to whether the defendant committed murder or voluntary manslaughter, you should return a verdict of voluntary manslaughter.

"3.—If you have a doubt as to whether or not there was a sudden heat of passion such doubt should be decided in favor of the defendant and therefore, in favor of the existence of such heat of passion.

"4.—Heat of passion is a state of mind to be determined only by you, gentlemen of the Jury.

"5.—Gentlemen, if you have any doubt as to whether the defendant committed second degree murder or manslaughter, you should find the defendant guilty of manslaughter inasmuch as if you are in doubt as to whether or not the defendant committed murder, you should find him guilty of manslaughter."

The instructions were refused on the ground that the court understood that there was no evidence to justify instructions as to the offense of voluntary manslaughter.

The two questions which we must consider in the present appeal may be stated as follows:

1. When and under what circumstances may the court, in a murder case, refuse to give instructions as to the elements constituting the crime of voluntary manslaughter?

2. Was there in the instant case such lack of evidence as to the elements of manslaughter to justify the decision refusing the instructions proposed by the defense?

■ In the case of *Mow* v. *People,* 31 Colo. 351, 72 Pac. 1069, as in the instant case, the lower court did not give any instructions to the jury as to the crime of voluntary manslaughter. In affirming the conviction of second degree murder, the court said:

"The next point we shall consider is the claim of counsel for plaintiffs in error, that the court erred in directing the jury that

the verdict must either be murder in the first or second degree, or not guilty. The particular objection urged is, that this instruction leaves out of consideration any charge of the crime of manslaughter. There are two reason why this objection is not well taken. In the first place, there is not a particle of testimony which would have justified the jury in finding the defendants guilty of either grade of manslaughter. . . The trial judge was not required to instruct upon a question not involved in the case.''

In *Demato* v. *People,* 49 Colo. 147, Am. Ann. Cases, 1912A, p. 783, it was held:

''It is well settled that in a prosecution for murder where there is no evidence from which a jury would be justified in finding the defendant guilty of manslaughter, a trial judge is not required to instruct upon that grade of homicide.''

In *Crawford* v. *People,* 12 Colo. 290, 20 Pac. 769, the court reversed the judgment of conviction of murder, because the trial judge had refused to give instructions as to voluntary manslaughter saying:

''There is some contrariety of judicial opinion with reference to the duty of a trial court in charging juries upon the different grades of felonious homicide. Certain authorities seem to hold that in such cases the law bearing upon all grades included in the indictment should be given, regardless of the evidence before the jury. But a careful examination of the subject leads us to the conclusion that the following rule is supported by a large preponderance of authority. When there is any evidence whatever tending to establish a certain statutory grade of criminal homicide, and the court refuses to charge the jury with reference thereto, error is committed; but, if there be a total absence of evidence relating to the particular grade disregarded, the charge cannot be successfully challenged on the ground of such omission. (Numerous citations.)

''But where there is an affray, and where self-defense is a defense relied on, the court exercises an exceedingly dangerous prerogative in refusing to charge upon the minor, as well as the graver, offenses covered by the indictment. He should be absolutely certain that there is an entire absence of evidence bearing upon the particular grade or grades omitted.

''The refusal of the court below to instruct in this case upon the subject of voluntary manslaughter was error. By statute, the ac-

cused in criminal cases is permitted to become a witness, and when once upon the stand all the ordinary rules of evidence apply to him. He is subject to cross-examination, his testimony may be impeached, the circumstances under which he testifies may be considered, and perjury on his part can be as readily disclosed as in the case of other witnesses. The jury are to give his testimony such credit and such weight as in their judgment shall, under all the circumstances, be proper. They may accept it as true, or they may reject it as false. But, however incredible or unreasonable such testimony shall seem, the accused is entitled to an instruction upon the hypothesis that it may be true. *People* v. *Keefer*, 65 Cal. 232, 3 Pac. 818; *State* v. *Banks*, 73 Mo. 592.''

And in the same case which we have just cited, the court, after making a summary of the testimony of the defendant in his own defense, said:

''There were circumstances tending to excite a 'sudden heat of passion.' Whether such circumstances amounted to the statutory provocation,' or caused the passion which the statutes denominates 'irresistible,' was not for the court to determine. The testimony of defendant shows the existence of violent anger and, if it were accepted as true, might have led to a verdict of voluntary manslaughter.

''We do not say that such should have been the verdict, or that the jury would have found differently had they been properly instructed. What we do say is that there was not an entire absence of evidence tending to establish the crime of manslaughter, and that defendant was entitled to an instruction with reference thereto. It is obviously impossible for us to hold that the error thus committed was without prejudice.''

See: 13 Cal. Jur. 612, Par. 1; 13 R.C.L. 787, 791, 792; *Jones* v. *State*, 26 S.W. 1082; *Johnson* v. *State*, 5 L.R.A. (N.S.) 809 and note; *Lewis* v. *State*, 231 S.W. 113.

The Federal Supreme Court has also considered this same question in the cases of *Sparf & Hansen* v. *United States*, 156 U.S. 51, and *Stevenson* v. *United States*, 162 U.S. 313, 40 L. Ed. 981. In reversing the judgment in the last case cited, on the ground that an instruction to the jury on the crime of manslaughter had been refused, the court said:

"The question is whether the court erred in refusing this request. The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder. . . . The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self defence, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court."

This Supreme Court has carefully studied this same question in several cases which we will examine briefly:

In *People* v. *Crespo,* 21 P.R.R. 285, 293, it was said:

"It is true, as pointed out by the *fiscal* in various parts of his brief, that no specific instructions were asked on the part of the defendant, but this court, following the Code of Criminal Procedure, has never hesitated to examine the instructions to find if any fundamental error has been committed. We think that there was a fundamental error in not giving instructions with regard to murder in the second degree and also with regard to manslaughter . . . Under any view of the case, given the somewhat singular circumstances of the death, the defendant was entitled to instructions with regard to the lower degrees of the crime."

See also *People* v. *Roldán,* 27 P.R.R. 719.

In *People* v. *Rodríguez Dapena,* 35 P.R.R. 395, 397, the only important evidence was the written confession of the defendant, relating how he had killed his wife and her lover and describing the quarrel which took place between him and the lover before the defendant fired the shots. In reversing the judgment, this court said:

"Given the facts it was within the province of the jury to say whether or not the unlawful killing took place upon a sudden quar-

rel or heat of passion. Despite the fact that the defendant came *armed* and very angry to the house of his wife, it was for the jury to determine whether the actual killing was produced by sudden passion. The failure to instruct as to manslaughter was error and the *Fiscal* agrees with this conclusion.''

A judgment of second degree murder was also reversed on the same ground in the case of *People* v. *Fernández,* 49 P.R.R. ____, this court saying:

''It does not matter how incredible certain evidence may appear to the judge who conducts a trial before a jury. It is not his province but that of the jury to pass upon the credibility of the witnesses. It can not be maintained in this case that there was no evidence to warrant an instruction of manslaughter, and the refusal to give it under the circumstances is a prejudicial error.''

Let us see now if in the instant case the trial court departed from the rule established by the cases which we have just cited.

We have made a careful study of the evidence presented by the prosecution and by the defense. The evidence shows the following facts to be unquestionable:

The defendant and the deceased worked as payroll clerks in a cane plantation of the Loíza Sugar Company. They were friends. The defendant occupied a higher position and earned a larger salary than the deceased.

Due to the fact that the defendant had undergone a surgical operation of his genital organs, the deceased had on several occasions poked fun at the defendant, saying in the presence of other persons that he, the defendant, was a *mariquita,* a *maricón* and a *capao.* The defendant on all of these occasions protested in a correct manner against the jokes of his friend, remonstrating and begging him to stop shaming him in this way. On none of the occasions on which the deceased thus slurred the defendant in the presence of other persons, did the defendant attempt to rebuff the offense attacking his detractor.

On March 20, 1934, at about 3:30 in the afternoon, when the defendant and the deceased were alone in the small office where they used to work together, a discussion arose between the two because of the refusal of the deceased to obey certain orders of the defendant. The latter testifies that he again begged the deceased to refrain from provoking him by having those offensive words; that then the deceased repeated the same injurious phrases, and that upon hearing them the defendant lost his patience, took the revolver which was on a shelf and fired at him without realizing what he was doing. The defendant has admitted that he fired the two shots while the deceased was working, seated at his desk, with his back toward him, and unable to see him as he approached revolver in hand; and that he fired at him from a distance of about a foot and a half or two feet. Immediately afterwards the defendant voluntarily confessed to several persons who gathered at the spot that he was the one who had killed Justo Maldonado, telling them: ''I did it because he was annoying me; I had to do it because he was annoying me.''

And upon being questioned by witness Carlos Bird, bookkeeper of the Loíza Sugar Company, as to the motives for the crime, the defendant told him that the deceased had been annoying him a great deal by saying improper things which affected his honor as a man. To the reply of Bird to the effect that this was no reason for killing a man as he had done, the defendant answered that he had very powerful reasons and he had done it under that impression, that he could not permit any man to say such things to him; and when Bird asked him how he had committed the crime, the defendant told him that he got up from his seat and went on tiptoe and killed him, firing at his back. Witness Bird also testified that the defendant told him that on the night before the crime, the deceased had chided him with words offensive to his honor and which naturally annoyed him, and that he thought of killing him but that he did not have the

courage to do it at that time; that he felt sorry because he liked him and did not wish to fight him face to face; that while he was his companion in the office he could not do any-thing, that he waited for the other employees to go out.

All of the witnesses agree that upon arriving at the spot they found the body of Maldonado seated at his work table, with a pencil in hand and his head resting on the payroll on which he was working when surprised by death.

The testimony of the defendant as to the repeated provocations made by the deceased and as to the heated discussion between the deceased and the defendant a few moments before the crime has been corroborated by the testimony of several witnesses.

The medical report shows that the body had received two bullet wounds, both in the posterior cervical region, one at the right and another at the left, the latter having its orifice of exit in the zygomatic region. Both wounds were necessarily fatal.

The prosecution argues that the lower court acted properly in refusing to give instructions dealing with voluntary manslaughter, because there was no evidence to justify such instructions; that the very words of the defendant "I had to do it because he was annoying me", not only do not prove the heat of passion, but constitute one more evidence of the murder; that the state of mind of the defendant when he killed was no other than that of vengeance, of rancor, of cruelty; that that state of mind was not the result of the moment, but that he had been preparing for some time before, searching for the opportunity to satiate his rancor; that the testimony of the medical expert and of witness Carlos Bird, shows that the shots were fired from behind, the defendant going on tiptoe to a distance of two feet from his victim, behind his back, without the victim having an opportunity to become aware of the attack or to defend himself.

We accept the argument of the prosecution as solid and well grounded. Carefully considered, the evidence of the

defense does not show the existence of the heat of passion which the law considers sufficient to diminish the seriousness of the crime. The form and manner in which, according to the confession of the defendant himself, he committed the crime, after waiting for the other persons to leave the office, going silently to wound his victim from behind and firing not one but two shots from a short distance at the base of the skull of the deceased, are incompatible with the existence of that passionate state of mind which clouds understanding and inhibits reason.

The lower court was justified in refusing the instructions requested by the defense.

This is one of those cases, unfortunately frequent, in which the victim brought about his own death and the misfortune of his aggressor, by his insistence in annoying and provoking the latter to the point of forcing him to think out and execute, as the only means of insuring his own tranquillity, the suppression of the provoker. The law can not authorize any one to take justice into his own hands. Our laws provide adequate remedies to which the defendant could have and should have had recourse to protect himself against the provocations and slander of his victim.

Subdivision 4 of Section 237 of our Penal Code provides:

"4.—No verbal provocation justifies an assault and battery, but insulting and abusive words may be given in evidence in mitigation of the punishment affixed to the offense."

We are of the opinion that, considering the special circumstances of this case, the sentence of 16 years in prison imposed by the lower court is excessive and that it should be reduced to 10 years in prison at hard labor, which is the minimum punishment authorized by law.

Thus modified, the judgment is affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.